*TOLEDO CONS. ST. RY. CO. v. THOMAS SWEENEY ET AL.

1. JOINT LIABILITY OF RAILROADS AND MUNICIPALITY.

For injuries received by the fall of a bridge, erected by a railroad company so that a public street could cross its tracks, while a street car is crossing, the street railroad, the municipality, and the steam railroad, all of whom had notice of the unsafe condition of the bridge, are jointly liable.

2. DAMAGES FOR PERSONAL INJURIES NOT EXCESSIVE.

A verdict of $14,000, for personal injuries, in favor of a man twenty-five years of age who is permanently crippled so as to probably require medical attention all his life, and who had previously been in good health and earning $1.80 a day, will not be interfered with by a court of error on the ground of passion or prejudice.

ERROR.

HAYNES, J.

On April 15, 1892, Thomas Sweeney, then a conductor upon the cars of the Toledo Consolidated Street Railway Co., in Toledo, was in charge of one of the cars crossing a bridge over the track of the Lake Shore & Michigan Southern Railway Co. at the junction of St. Clair street and Maumee avenue. The car upon which he was riding, and which he had charge of, had received some injury or become defective, and for the purpose of returning it to the stables of the company it was being pushed by another car of the company to which it was attached, of course. While the cars were upon this bridge, the bridge suddenly gave away and fell, bringing the two cars together. Sweeney was standing upon the rear end of his car, and one Mammett, of the other car, was standing immediately opposite, and as the cars went down the rear end of the car upon which Sweeney stood collided with the front end of the other car, and he received severe injuries, Mammett at the same time being killed.

Sweeney brought an action in the court of common pleas against the Con. St. Ry. Co., the city of Toledo and the L. S. & M. S. Ry. Co., jointly and recovered for the injuries which he received upon this occasion. He set up in his petition the various facts upon which he claimed that each of the defendants were liable to him by reason of negligence upon their part causing the injuries which he had received.

The case passed to trial in the common pleas, was tried to a jury and a verdict was rendered in favor of the plaintiff for the sum of fourteen thousand dollars, and each of the defendants filed a petition in error. They deemed it necessary each to take a bill of exceptions, and upon the overruling of the motions for a new trial each filed a petition in error, so that the case stands here upon three bills of exceptions, and three petitions in error, all in one case. Whether it was necessary to have so many bills of exceptions is perhaps a question; the bills are each a copy of the other.

The fundamental basis of the petition is, first, that the L. S. & M. S. Ry. Co. was obliged, by virtue of sec. 3284 Rev. Stat., to build, maintain and keep in repair a bridge at this point over the line of its road. The road was opened after the construction of the original bridge. Whether the keeping and maintaining of that bridge would come within the limits of that statute, is a question that is not urged here. There seems to have been some talk about it in the court below; but the court held—and that seems to have been acquiesced in here— that inasmuch as the Lake Shore company had assumed to build that bridge

* This judgment was affirmed by the Supreme Court, three judges dissenting; unreported. 52 O. S., 617. The circuit decision is cited as authority, by the same circuit, in Tol. Con. St. Ry. Co. v. Mammett, 6 Circ. Dec., 244; it is also cited in Newark v. McDowell, 9 Circ. Dec., 260.

originally and keep and maintain it, and had done so for a long period of time, that they were still liable for its maintenance and continuance. Under the decisions of the Supreme Court it is said that the company is bound to maintain that bridge so long as it keeps and uses its franchise.

The liability of the city of Toledo, it is claimed, arises upon the fact that this bridge is within the limits of the city of Toledo and connecting one public street with another, and that the obligation rests with the city of Toledo to maintain and keep the streets and bridges in repair, open and free from nuisance.

As to the liability of the Consolidated Street Railway Company, it is claimed to rest upon the fact that they were using this bridge and this street for the purpose of traveling over them a long time after they had knowledge that the bridge was in a defective and dangerous condition.

The evidence shows substantially this state of facts:

Sweeney, upon the morning upon which he received his injury was at the barns of the street railway company upon Cherry street and he went there to take his car; and while he was there he went to the person in charge of the barns, and who it is claimed had charge of the men, who sent them out and directed them when to go and how to go upon their cars, and told him that he had been informed by certain parties that the bridge over the Lake Shore road upon St. Clair street was out of order and was dangerous, and he asked that he might be excused from going out upon his car that day—lay off. The person in charge and the person to whom he applied—Pelton by name—told him that he had no other man; that if he had another man he would let him lay off, but he had no other man, and he would make some inquiries. Thereupon another person present, one of the employes of the company, Stahl by name, telephoned to Denman, who was the general superintendent, as I understand it, of the company, stating the facts in regard to the bridge and stating what this man wanted. He telephoned back that an examination had been made of that bridge, by the officers of the company, and that the bridge was in good condition and that he should have no fear but to go ahead. Thereupon Sweeney got upon his car and proceeded, Robert McMahon being the conductor of the car with him. McMahon's testimony is that Sweeney told him substantially what he had told the other parties; that some man said that the bridge was out of repair and that he was going to speak about it; and after they started out and got up towards the bridge he told him to look at the bridge, and McMahon says that the bridge swayed and sagged five or six inches as they went over it; but they went on about their employment during the day and McMahon made no report of it to anybody, and didn't seem to trouble his head about the matter.

Another witness testified that he was in the employ of the company between nine and ten o'clock of the evening before, and came across this bridge, and as he was crossing the bridge he saw Mr. Denman upon the bridge and spoke to him about the bridge, that there had been something said about the bridge being out of repair, and asked him what he thought about it and Denman said the bridge was good for a thousand—practically, that the bridge was all right, and he should go on. As he passed over the end of the bridge and came off, he saw Mr. Lang, the general manager, sitting in his buggy, by a telegraph pole some 20 or 30 feet from the end of the bridge. He didn't speak to him, but says he passed on down town.

About half-past six upon the evening of the 13th as these two cars were going over, as stated, the bridge fell and this plaintiff received his injury.

It is claimed on the part of the street railway company that all the information that they obtained in regard to this bridge was obtained through the plaintiff, Sweeney, and that if any liability exists on the part of the company towards him, he himself is chargeable with knowledge of the condition of the bridge at that time as fully and completely as the defendant company. That is the claim as we understand it.

Now we cannot accept that view—or, we do not reach the same conclusion, rather in regard to the condition of matters. It would seem from the testimony of Mr. Pelton, that some parties before had made charges in regard to the condition of the bridge, because the plaintiff says that when he spoke to Pelton, Pelton said that some one had spoken to him before, or that he had received such information before. But it was telephoned back that morning that an examination had been made of the bridge by the officer. It appears from the testimony of Stahl that Lang and Denman were in the vicinity of the bridge the evening before; but, for some unexplained reason, neither Mr. Lang nor Denman testified. There is no evidence of the examination which they did or did not make of the bridge, that evening, nor was there any direct proof that the examination was made, other than the statement that was telephoned back by Denman. Some discussion was had before us in regard to the question as to whether there are sufficient allegations in the petition charging the defendant company—which is the street railway company—with knowledge of the condition, that is to say, whether they are charged in the petition with knowing these facts or having the means of knowing them, and if I understand the statement correctly, that there was no allegations that the plaintiff was without knowledge. I may be mistaken on that point. We have examined the amended petition very carefully, and, while the petition might be drawn more clearly than it is and with more care—which would have saved us a great deal of trouble in the matter—yet we think that a fair and just construction of that petition shows that these points and allegations are there, though it is complained that they are not there. It is not very clearly drawn, but we think a fair construction of it is sufficient to maintain the contention of the plaintiff below in that regard.

Now, it is said that it was argued here, that even if this statement was made to the plaintiff that morning by Pelton at the barns, that it is not pleaded as an estoppel, nor does it come within the definition of the rules of law laid down by the Supreme Court of this state which enables a party plaintiff to rely, after making complaint, upon the promise or statement of his employer as to what he will or will not do in regard to the work. We think the testimony was properly receivable and may properly be used and relied upon by both the jury and the court, for the purpose of showing the circumstances under which the plaintiff went upon the bridge; and the testimony clearly shows that having received some information himself—he says, in his own testimony, having no knowledge in regard to the matter—that upon requesting to be relieved from going upon the road that day, he was told by his employers that there was no danger, that the bridge was in good condition. Now, certainly that goes to the extent of his knowledge, it is testimony tending to show that he did or did not have knowledge of the condition of the bridge, and it is testimony that we think is entitled to go in evidence without being pleaded. He avers in the petition that he had no knowledge of this matter, and we are disposed to sustain his allegation and the jury might rely upon it as showing that he had no knowledge of the bridge which would affect his right of recovery, or prevent his recovering.

We have read the decision of the Supreme Court cited Coal & Car Co. v. Norman, 49 O. S., 598, and have endeavored to give the matter full and careful examination and have discussed the matter; for there are other points made; for instance, the point that the street railroad company had no right to repair this bridge because it was charged with no duty in regard to it; and that is said by the court below to be true; that is true, but we think the court below substantially put the ground of the plaintiff's liability in that regard upon the proper basis, and that is upon the question of negligence upon its part, whether it was negligently using that track for the purpose of propelling its cars along it, when it had knowledge, or reasonable information or means of knowledge—of knowing that the bridge was not in a fit condition for the passage of cars over it. And we think, under the evidence, that the jury might well find, from the statements of the testimony, that they had knowledge such as would charge them with some duty to

this plaintiff in regard to the passing of its cars over that road, and in regard to the defective condition of the bridge at this time—of which we will speak a little later on.

In regard to the city of Toledo, the city, as I have already stated, by the statute is chargeable with the maintenance of the bridges of the city. Of course, there are questions which arose and which were discussed and upon which the court was asked to charge the jury, in substance, that the fact that the railway company had assumed—or the fact that it was bound to maintain and keep it up and in repair, did not relieve the city from its obligation, so far as the public was concerned and so far as the plaintiff is concerned, from its obligation to keep that bridge in proper repair and fit for travel, or else to prevent parties from passing over there.

It is alleged by counsel on behalf of the city that there was no contract liability between the city and the railway company; that the street railway company was a mere licensee upon the street; that the city merely gave it permission to propel its cars on the street; and they stated that the city was not bound to keep the bridge up or to keep the street in repair for that company to pass its cars over it, and if the company received any injury by reason of the defective condition of the street, or if its employes received any injury, there was no liability on the part of the city, no such obligation existing against it as gave a right of action against the city. We have examined these authorities and we are unable to concur with the counsel in the position which he seeks to maintain here. We think that there was some obligation existing on behalf of the city and some contract liability—if we chose to use that form of language—but, at any rate, the same duty and the same liability upon a breach of duty that there would be if the driver of a public conveyance upon the street was injured by any negligence upon the part of the city in not keeping the street in repair.

In regard to the liability of the city, the first knowledge that the city seems to have had in regard to this matter was this: That upon that morning the assistant engineer started to go up to the western part of the city, upon some work, and took the cars, and, in passing over the bridge he noticed that the bridge was swaying and yielding, and he immediately got off the car and proceeded to make an examination of the bridge; and during the course of the examination he found that one of the cords of the bridge—beams, I suppose he would call it—near the end of the bridge, was decayed—decayed at the end of the bridge. Upon that beam and resting upon an iron plate were some of the supports of the bridge—I don't know what he calls those—but at any rate they are the base of a sort of an arch that uphold, support and maintain the bridge; that while the timber, outside, appeared to be all right, it had become rotten in the center and had given way and the plate was shoved off, perhaps nearly six inches, and that had allowed this arch to lengthen and had materially weakened the bridge. Like a prudent officer that he was, he immediately went to a telephone and telephoned to the city engineer. The engineer himself was not in, but persons who were there were informed of the condition of affairs, and immediately upon the return of the engineer himself to the office, he was informed of the condition of that bridge, in detail, it seems, and thereupon he turned around to the 'phone and telephoned to the engineer in charge of the Lake Shore railway, who it seems at that time was in the depot in this city—the offices of the railway company being there—and he told the engineer of the Lake Shore Company that this bridge was dangerous, that being the substance of the language which he used—was then in a dangerous condition—that such information had been received.

The engineer himself testifies that he received notice from the city engineer, using the language, first that the bridge was unsafe, and also repeated that the bridge was in an unsafe and dangerous condition, but neither of these parties were sufficiently alarmed about the matter, or exercised, to go any further, and

seemed to have thought that the matter might rest along a little—that there was no immediate danger. And there the matter rested.

No steps were taken by the city engineer or authorities, no information given, no orders issued in regard to the matter, and this young assistant went on up and performed his labor and came back and had some conversation, I believe on his return, with the engineer, but nothing was said or done; and the accident occurred that evening.

So far as the city is concerned, we think there is a direct and clear liability on their part to the plaintiff also. The condition of the bridge as stated to the engineer ought to have been sufficient to have enabled any engineer to know that the bridge was certainly in a very unsafe and dangerous condition. He ought to have understood that more fully than any other person not a professional engineer; because it seems from the statements made by the engineers in regard to the bridge that the moment this piece gives way the whole superstructure is liable to fall. It loosened the arches and overcomes the strength of the cords, weakening the bridge beyond what an ordinary person would be apt to conceive, leaving it in a very dangerous condition, and the city had knowledge of the fact through its city engineer in abundant time to have closed the bridge, and they should have closed it to travel and kept people away from and off of it.

Coming down to the Lake Shore Company, I had a little more doubt whether there would be any liability on the part of the Lake Shore, no continuing liability on their part to keep up and maintain the bridge. They assume that it was the duty of the company to do that, under the statute. It seems that a bridge had been built—one or more—but at any rate the present structure had been put up in the year 1887, that is to say a new bridge had been put up. At that time there was in use, so far as street railways were concerned, only horse cars upon that road, electric cars not having been in use in the city, I believe, at that time. The bridge was built throughout of good material, by a competent bridge builder, under the charge, as was testified, of one of the best bridge builders in the state, a man who for 20 years superintended the business of the Lake Shore Company in the construction, maintenance and preservation of its bridges. And that bridge had been examined regularly about every six months, the custom being to do that at about those periods. It was examined in the October previous, and that was done as was testified by the engineer of the company by examining it from end to end. If anything appears defective or indicates rot in the interior, they used augurs to bore in and examine it. Ordinarily they used an instrument like a heavy hammer or sledge, or something of that kind with a round head, constructed for the purpose, and it is said that upon striking a piece of timber that is decayed in the interior that it gives out a sound that a person accustomed to such work can tell whether that timber is rotten or not.

It is said that in the fall an examination of the bridge was made thoroughly. This accident occurred in May following. The bridge had been sustaining a heavy amount of travel and traffic. There is some evidence tending to show that there was a large amount of travel on the 1st of May and two weeks previous at the time of the dedication or consecration of the Catholic church in the Fifth ward, when a very large number of people went up to attend the services and that the company took over its electric cars, and drew trailers, as they are called, being old horse cars, and very heavily loaded—and whether that had any effect on the bridge, does not appear.

Now, upon this particular day, about 11 o'clock in the morning, Mr. Rockwell, the engineer of the Lake Shore Company, was informed that this bridge was then in a very dangerous condition. He himself testifies that it was in a dangerous—or sometimes it is put as being in an unsafe condition; and the question was put to him as an engineer whether upon the facts stated by the assistant engineer of the city in his testimony—whether if the beam was rotten, whether if the iron plate had slid the distance it was said to have slid—some four or six inches—straightening out the arches, if that bridge was in a proper

condition to be passed over by team or cars, and he said it ought to have been closed immediately; that there was only one thing to be done as a matter of prudence, and that was to have closed the bridge. Now without making any inquiries of the city engineer as to what had been found there in regard to it—for nothing of that kind was communicated by the city engineer so far as the evidence discloses—he himself seems to have jumped to the conclusion that perhaps it was safe enough for a little while. He, however, immediately turned and telegraphed to the chief bridge builder at Cleveland, to give the matter attention. He said it would take the matter of a week to get the material together for the fixing of the bridge. He himself didn't go to see the condition of the bridge or make any examination of it at that time. Now it would seem that up to 11 o'clock that the Lake Shore road had not been derelict in making annual examination. It seems that the life of a bridge of that kind is for ten years or so, and this bridge had not been standing over about five years, and had been semi-annually examined and found in good condition; it seems that up to that time there had been no negligence upon the part of the railway company, as shown by the evidence, but upon mature consideration, it does seem that upon knowledge being imparted to the engineer that a bridge of that kind was in a dangerous condition, and then in an unsafe condition, a bridge that had been used to his knowledge for the transportation of electric street cars over it, over which a very large amount of travel was passing from day to day, that a proper sense of care in regard to the public and those who passed over the bridge would have induced him to make some examination—*should* have induced him to have made some examination of that bridge for the purpose of ascertaining whether or not people should be allowed to pass over it.

It is said that there is force in the argument, that the railway company had no right to close that bridge; that the construction of the street and the control of the bridge was with the city authorities, which is true; nevertheless, they might have stationed parties there to give warning and to have protected the public from passing over the bridge, or it could have taken steps in connection with the city to have had the bridge closed; but I am inclined to the opinion myself, upon mature consideration, that there was a liability on the part of the company arising from the fact that the engineer himself did not take such steps as a prudent engineer should have taken, to ascertain the condition of the bridge, he being but a little ways from it.

There is one other question that has been urged upon us, and that is this: That this verdict is *excessive*. The verdict was $14,000. That is a pretty large sum of money, and of course it challenges the attention of the court in regard to the amount of it. Our attention, of course, has been called to this by counsel in argument.

It is a very difficult matter to ascertain, in some of these personal injury cases, the amount of judgment that should be awarded or that may be awarded. This plaintiff is not far from 25 years of age; he is a man that was in good health prior to this time. He was earning about $1.80 a day. We presume he could have continued to earn that amount; we don't know whether he would have developed into a man of business or not. He has been injured. Now if he were a well man and getting $1.80 per day, the court could come to some pretty definite conclusion what his services at that price would be worth during the balance of his life. If he had met the fate of Mammett, the motorman on the other car, and had been killed, and then suit were brought under the statute we could arrive at some definite result as to the value of his services by the use of tables calculated for that purpose. The evidence in regard to his physical condition rests of course upon his testimony, and very largely upon the testimony of two physicians and surgeons. One is Dr. Woods and the other Dr. Wright; and the testimony of these surgeons concurs in showing that this man has received very severe injuries, which seem to affect seriously his spine and kidneys, and perhaps other portions of his body. It is also a fact that according

to their testimony he will never be any better, and that he will never be able to work. His personal appearance at the present time indicates that he is a man who is in a very bad condition physically. The testimony of these physicians we must rely upon as a matter of course. The one we know to be a very able surgeon; the other is a very large practitioner, and I don't know but he has a large amount of experience as a surgeon also, and we are bound to take this evidence as showing what the future prospects of this plaintiff are; that is to be an invalid, unable to work and suffering. In some respects his disease is of such a nature that it is offensive to all persons about him, as the result of his injuries.

The prospects are that he will be compelled to employ physicians, and he may be compelled to employ assistants before he is through life to take care of him. He will be a sufferer physically and will go down to his grave with a feeling that life is not very pleasant one at any rate, that he is a permanent cripple and all his life will be oppressed with that physical condition. Now it is very difficult to state what would be a fair compensation or to establish any permanent rule that could be followed. He should be awarded that which will give him at least the means of a livelihood as fully and completely as he would be able to earn if he were well; it should be sufficient to minister to his personal comforts as long as he lives, and furnish him with medical aid and clothes and things which he may need. If there is anything beyond that, the physical suffering and the pain which he will endure, the humiliation and the real burden which is upon the man's mind and which will follow him all his life, are to be considered. Now, after taking all these matters into consideration and looking the ground over, we are unable to say that the jury erred or rendered a verdict here which is excessive, through either prejudice or passion or appearing to be under the influence of passion or prejudice. Indeed we are unable to say that the verdict is excessive in itself, and therefore we decline to disturb the amount which has been rendered by the jury.

Judgment of the common pleas affirmed, without penalty.